**UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| JESSE JORDAN, individually and on behalf of all others similarly situated,<br><br>                  Plaintiffs,<br><br>   v.<br><br>RAPTOR PHARMACEUTICAL CORP., JULIE ANNE SMITH, CHRISTOPHER M. STARR, RAYMOND W. ANDERSON, SUZANNE L. BRUHN, RICHARD L. FRANKLIN, GEORGES GEMAYEL, LLEW KELTNER, and GREGG LAPOINTE,<br><br>                  Defendants. | Case No.<br><br>CLASS ACTION<br><br>**CLASS ACTION COMPLAINT FOR:**<br>**(1) Violation of §§ 14(d) and 14(e) of the Securities Exchange Act of 1934 (17 U.S.C. § 78n(a))**<br>**(2) Violation of § 20(a) of the Securities Exchange Act of 1934 (17 U.S.C. § 78t(a))**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Jesse Jordan ("Plaintiff"), by his attorneys, alleges upon information and belief, except for his own acts, which are alleged on knowledge, as follows:

<u>**SUMMARY OF THE ACTION**</u>

1.      This is a shareholder class action brought by Plaintiff on behalf of holders of the common stock of Raptor Pharmaceutical Corp. ("Raptor") against the Company's Board of Directors (the "Board" or the "Individual Defendants") in connection with the proposed acquisition by Horizon Pharma plc ("Horizon") and Misneach Corporation ("Merger Sub") for violations of Section 14(d)(4) and 14(e) and 20(a) of the Securities and Exchange Act of 1934

(the "Exchange Act").

2.      This action seeks to enjoin Defendants from further violating the federal securities laws in their pursuit of a sale of the Company at an unfair price and through an unfair and self-serving process to Horizon.

3.      Headquartered in Novato, California, Raptor is a biopharmaceutical company that develops therapies treating rare debilitating and often fatal diseases like cystinosis, Huntington's disease, and Cystic Fibrosis.

4.      On September 12, 2016, the Company announced that it had entered into an Agreement and Plan of Merger (the "Merger Agreement") in which Merger Sub has agreed to commence a cash tender offer to acquire any and all of the outstanding shares of the common stock of the Company for $9.00 per share in cash (the "Tender Offer").  Following the consummation of the Tender Offer, Merger Sub will merge with and into the Company (the "Merger"), with the Company surviving as a wholly-owned subsidiary of Horizon, in a deal worth approximately $800 million.

5.      As described more fully herein, the Merger was approved by a conflicted Board who was interested in maintaining their positions and rushing a sale of the Company.

6.      As a result of the flawed and inadequate process, the Merger Consideration fails to adequately compensate Raptor shareholders for their stake in the Company, despite its strategic positioning as a leader in an expanding marketplace.  Raptor has shown strong growth over the last few months, and is expected to continue to outperform.  In fact, Raptor's QUINSAR has experienced huge success, which is only expected to continue in the future.

7.      Exacerbating matters, Defendants have agreed to lock up the Tender Offer with certain deal protection devices which preclude other bidders from making successful competing

offers for the Company, including: (i) a strict non-solicitation provision that prevents the Company from soliciting other potential acquirers or even continuing discussions and negotiations with potential acquirers; (ii) a "last look" provision which allows Horizon four business days to re-negotiate with the Board after it is provided with written notices of any unsolicited third-party bid that may be presented to the Board; and (iii) a termination fee provision whereby the Board agreed to pay Horizon $30 million in the event that the Company receives a higher offer to acquire Raptor and terminates the Agreement.

8.      The unreasonable terms, taken together, foreclose on the possibility that a bidder will assume the significant time and expense required in order to engage in the process at this late stage.  In addition, the deal protection provisions substantially and improperly limit the Board's ability to act with respect to investigating and pursuing superior proposal alternatives, including a sale of all or part of Raptor.

9.      In violation of sections 14(d)(4) and 14(e) and 20(a) of the Exchange Act, the Defendants caused to be filed a materially deficient 14D-9 Solicitation/Recommendation Statement (the "14D-9") with the U.S. Securities and Exchange Commission ("SEC") in an effort to solicit stockholders to tender their Raptor shares in the Tender Offer.  The 14D-9 is materially deficient and deprives Raptor shareholders of the information they need to make an intelligent, informed and rational decision of whether to tender their shares in the Tender Offer. As detailed below, the 14D-9 omits and/or misrepresents material information concerning, among other things: (a) the financial projections prepared by Raptor's management, which were utilized by the Company's financial advisers, Centerview Partners LLC ("Centerview") and Leerink Partners LLC ("Leerink"), in their respective financial analyses underlying their fairness opinions; and (b) the data and inputs underlying the financial valuation analyses that purport to

support these fairness opinions.

10.     Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Tender Offer without first curing their violations of federal securities law in order to prevent irreparable harm to the Company's shareholders.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa ) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(d) of the Exchange Act and Rule 14d-9 promulgated thereunder and Sections 14(e) and Section 20(a) of the Exchange Act.  This action is not a collusive one to confer jurisdiction on a court of the United States, which it would not otherwise have.

12.     Personal jurisdiction exists over each defendant either because the defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over defendant by this Court permissible under traditional notions of fair play and substantial justice.

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391, because Raptor is incorporated in the State of Delaware and each of the Individual Defendants, as Company officers or directors, has extensive contacts within this District.

## PARTIES

14.     Plaintiff is and has been at all material times, a public shareholder of Raptor. Plaintiff is a resident of the state of Ohio.

15.     Defendant Raptor is a corporation organized and existing under the laws of the State of Delaware.  The Company maintains its principal executive offices at 7 Hamilton

Landing, Suite 100, Novato, California.  Raptor common stock trades on the NASDAQ under the ticker symbol "RPTP."

16.     Defendant Julie Anne Smith ("Smith") has been the President since July 2014 and Chief Executive Officer ("CEO") and a director of the Company since January 2015.  Defendant Smith joined the Company in 2012 as the Executive Vice President, Strategy and Chief Operating Officer.

17.     Defendant Christopher M. Starr ("Starr") is a co-founder of Raptor and has been its Chief Executive Officer until December 2014, and director thereof since its inception in 2006.

18.     Defendant Raymond W. Anderson ("Anderson") has been a director of the Company since September 2009.  Anderson is also the Chairman of the Audit Committee and a member of the Compensation Committee.

19.     Defendant Suzanne L. Bruhn ("Bruhn") has been a director of the Company since April 2011.  Bruhn is also the Chairman of the Compensation Committee and a member of the Nominating and Governance Committee, and the Pipeline Steering Committee.

20.     Defendant Richard L. Franklin ("Franklin") has been a director of the Company since September 2009.  Franklin is also the Chairman of the Nominating and Governance Committee and a member of the Audit Committee and the Pipeline Steering Committee.

21.     Defendant Georges Gemayel ("Gemayel") has been a director of the Company since January 2015.  Gemayel is also the Chairman of the Pipeline Steering Committee and a member of the Nominating and Governance Committee and the Compensation Committee.

22.     Defendant Llew Keltner ("Keltner") has been a director of the Company since September 2009.  Keltner is also a member of the Nominating and Governance Committee, the Pipeline Steering Committee, and the Compensation Committee.

23.     Gregg Lapointe ("Lapointe") has been a director of the Company since January 2015.  Lapointe is also a member of the Audit Committee.

24.     Parent is a corporation organized and existing under the laws of the state of Ireland.  Parent is a biopharmaceutical corporation which engages in identifying, developing, acquiring and commercializing medicines for the treatment of arthritis, pain, inflammatory, and/or orphan diseases in the United States and internationally.

25.     Merger Sub is a Delaware corporation and a wholly owned subsidiary of Parent.

## CLASS ACTION ALLEGATIONS

26.     Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23, individually and on behalf of the stockholders of Raptor common stock who are being and will be harmed by defendants' actions described herein (the "Class").  The Class specifically excludes defendants herein, and any person, firm, trust, corporation or other entity related to, or affiliated with, any of the Defendants.

27.     This action is properly maintainable as a class action because:

(a)     The Class is so numerous that joinder of all members is impracticable.  According to the Merger Agreement, as of the close of business on August 18, 2016, there were approximately 86 million shares of Raptor common stock issued and outstanding.  The actual number of public stockholders of Raptor will be ascertained through discovery;

(b)     There are questions of law and fact which are common to the Class, including *inter alia*, the following:

i.      Whether Defendants have violated the federal securities laws;

ii.     Whether Defendants made material misrepresentations and/or omitted material facts in the 14D-9; and

iii.      Whether Plaintiff and the other members of the Class have and will continue to suffer irreparable injury if the Tender Offer is consummated.

(c)      Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature and will fairly and adequately protect the interests of the Class;

(d)      Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

(e)      The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class;

(f)      Plaintiff anticipates that there will be no difficulty in the management of this litigation and, thus, a class action is superior to other available methods for the fair and efficient adjudication of this controversy; and

(g)      Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## BACKGROUND OF THE COMPANY AND ITS POSITIONING IN AN EXPANDING INDUSTRY

28.      The Company was founded in 2005 and is headquartered in Novato, California. Raptor is a biopharmaceutical company which focuses on developing and commercializing transformative treatments for people affected by rare and debilitating diseases.  The Company's products include PROCYSBI, a delayed-release capsule, which is used for the management of nephropathic cystinosis in adults, as well as in children six years and older in the U.S, in the 28

member states of the European Union, Norway, Liechtenstein, and Iceland. The Company also provides QUINSAIR, a formulation of the antibiotic drug levofloxacin for the treatment of chronic pulmonary infections due to Pseudomonas aeruginosa in cystic fibrosis patients in Canada and Europe. The Company also has several clinical development programs, including RP103 which is used as a treatment for Huntington's disease; and RP103, which is used as a treatment for mitochondrial disorders, including Leigh syndrome. The Company's preclinical product candidates include RP105 and RP106 for various rare diseases. Raptor has a license agreement with University of California.

29.     On April 11, 2016, Raptor announced its first commercial sale of QUINSAIR in Europe, with sales in Germany and Denmark.  QUINSAIR is approved for sale in both the European Union and Canada for the management of chronic pulmonary infections due to Pseudomonas aeruginosa in adult patients with cystic fibrosis.  It is the first fluoroquinolone to be approved as an inhaled therapy for a pulmonary disease.  During the press release Dave Happel, Raptor's Chief Commercial Officer, stated, "Raptor is excited to offer a new, first-in-class inhaled antibiotic treatment option for the many patients and families living with cystic fibrosis and battling chronic bacterial lung infections. We are beginning the European launch of QUINSAIR in Germany and Denmark, and continue to pursue approval of QUINSAIR for CF patients in the United States…We are confident that QUINSAIR will be an important growth driver for Raptor. We expect QUINSAIR to increase our revenue base and enhance our long-term growth profile while leveraging our commercial and development expertise and our existing global infrastructure."

30.     The Company then announced new data analyses of its Phase 3 clinical study (MPEX-209) at the 39th European Cystic Fibrosis Conference, held from June 8 to June 11,

2016, in Basel, Switzerland.   Krishna R. Polu ("Polu"), Chief Medical Officer of Raptor, discussed the results in a press release on June 10, 2016, stating, ""Patients with cystic fibrosis have few approved inhaled antimicrobial options for the treatment of chronic *Pseudomonas* infection and in many cases, continue to have pulmonary exacerbations despite available therapies…We believe it is critically important to provide physicians with additional data that suggest that QUINSAIR may reduce the number of pulmonary exacerbations in patients with a history of frequent pulmonary exacerbations. Further analyses suggest that QUINSAIR administration did not increase the risk for colonization with new pathogens or lead to increased antimicrobial susceptibilities."

31.     On August 4, 2016, Raptor announced its second quarter 2016 financial results ended June 30, 2016.   The Company reported exceptional results for this quarter.   Global net product revenue increased 37.3% from $23.3 million in the second quarter of 2015 to $32.0 million.   The Company also experienced a significant increase in GAAP, from a net loss of $13.9 million, or $0.17 per share in the second quarter of 2015, to a profit of $14.0 million, or $0.16 per share.   The Company's non-GAAP also increased from $9.6 million, or $0.12 per share in the second quarter of 2015, to $11.3 million, or $0.13 per share.   Raptor has such a successful quarter, that it raised its 2016 global net revenue guidance $10 million, from $115 to 125 million, to $125 to 135 million.   Lauding these results, Defendant Smith noted:

> I'm delighted that we delivered another record quarter for sales, driven primarily by growing patient demand for PROCYSBI…For the first time, PROCYSBI revenue was augmented by sales of QUINSAIR, which is off to a terrific launch in Europe. Based on our outstanding commercial performance, we are pleased to raise our 2016 revenue guidance. We look forward to continued growth from both products and supporting patients living with rare diseases and with limited options.

32.     On September 7, 2016, just days before the Tender Offer was announced, the Company issued a press release announcing the results from a network meta-analysis comparing inhaled antibiotics for cystic fibrosis patients with lung infections involving Pseudomonas aeruginosa.  The study showed that QUINSAIR had efficacy comparable to three other inhalable antibiotics also approved for use in Europe.  Polu commented on these results, stating, "This network meta-analysis suggests that inhaled levofloxacin provides a useful addition to our armory in the fight against this common and difficult to treat infection…Given the chronicity and reduction in survival caused by *P. aeruginosa* infection in CF, the availability of inhaled levofloxacin is an important option for clinicians to maintain lung function in CF patients and an important step in tackling the unmet need in the CF community."

33.     Despite the Company's financial strength and position as a premier player in the biopharmaceutical industry, the Individual Defendants have entered into the Merger Agreement with Horizon, depriving Plaintiff and the other minority public stockholders of Raptor the opportunity to participate in the growth of the Company in which they have loyally invested.

**THE MERGER WAS THE RESULT OF A FLAWED SALES PROCESS
MARRED WITH CONFLICTS OF INTEREST**

34.     The process deployed by the Individual Defendants was flawed and inadequate, and conducted out of the self-interest of the Individual Defendants.  The sales process was marred with conflict and geared solely towards a transaction with Horizon.

35.     Discussions of potential strategic opportunities first began on January 13, 2016, when Defendant Smith and Michael Smith ("M. Smith"), the Chief Financial Officer ("CFO") of Raptor, met with representatives of a European biopharmaceutical company ("Company A") at an industry conference.

36.     The Company was then contacted by senior executives of a publicly traded biotechnology company ("Company B") in the U.S. on January 28, 2016, to discuss a potential stock-for-stock merger.  Raptor then entered into a confidentiality agreement with Company B, which included a customary two-year standstill provision that included a "don't ask/don't waive" ("DADW") provision.   Smith and the CEO of Company B then met on February 10, 2016.

37.     On March 8, 2016, Raptor had a discussion with Company A, during which Company A expressed an interest in acquiring all of the outstanding shares of Raptor common stock.

38.     On March 15 and 16, 2016, MTS Health Partners, L.P. ("MTS"), one of Horizon's financial advisors, contacted Smith to discuss a preliminary proposal for a potential acquisition of PROCYSBI/RP103 at a purchase from of $500 to $600 million.  On March 17, 2016, Timothy P. Walbert ("Walbert"), the Chairman, President and CEO of Horizon, and also interestingly, a former member of the Raptor Board for over three years, met with Smith at a banking conference and reiterated Horizon's interest.

39.     On March 21, 2016, the Raptor Board held a telephonic meeting, during which they discussed concerns with Horizon's proposal, including, among other things, the tax inefficiencies of the proposal.  The Board therefore instructed Smith to request additional details from Horizon.

40.     On March 23, 2016, the Raptor Board decided to engage Centerview to assist Raptor in connection with the potential transaction with Company B, which was later expanded on April 6, 2016, to include a broad review of strategic alternatives.

41.     On April 19, 2016, the CEO of Company A sent a letter to Smith expressing Company A's interest in acquiring the Company, indicating a preliminary equity valuation of $582 million to $671 million, or $6.50 to $7.50 per share.

42.     On April 24, 2016, Horizon confirmed in writing its interest in an acquisition of PROCYSBI assets for $500 to $600 million in cash.

43.     On May 16-17, 2016, the Raptor Board held in-person meetings, with management and representatives of Latham and Centerview present, during which Centerview provided the Raptor Board with an overview of a proposed process for a review of potential strategic alternatives by Raptor, focusing on a potential sale of the Company, the potential stock transaction with Company B, and an EMEA Divestiture.  The Raptor Board authorized Raptor's officers to retain and engage Leerink Partners LLC ("Leerink") to serve as co-lead financial advisor to Raptor in connection with the exploration of strategic alternatives.  The Raptor Board formed a transaction committee (the "Committee"), which consisted of Defendants Smith, Franklin and Bruhn, to oversee and manage the review and assessment of strategic alternatives.

44.     At the conclusion of the May 16-17, 2016 meeting, the Raptor Board authorized Centerview and Leerink to begin a strategic review of alternatives on behalf of Raptor and to communicate with each of Horizon Pharma, Company A, Company B and other potentially interested parties.

45.     On May 20, 2016, the Committee held a telephonic meeting during which Centerview and Leerink reviewed a list of 42 potential strategic counterparties with the Company.  Despite the large list, the Committee *only approved fourteen*, which *included* Company A, Company B, and Horizon.  Ultimately six more parties were added to the list, but two of these parties had contacted the company independently.

46.     On May 23, 2016, Smith informed Mr. Walbert that the Raptor Board did not believe that Horizon's prior proposal to acquire PROCYSBI / RP103 was in the best interest of Raptor's stockholders and that she believed that Raptor was significantly undervalued relative to its then market price.

47.     Of the 20 strategic parties contacted by Centerview and Leerink, 12 parties, including Horizon, Company A and Company B executed confidentiality agreements with Raptor.  Each of these confidentiality agreements included customary standstill restrictions with a term of one to two years and eight of the 12 confidentiality agreements included a "don't ask/don't waive" ("DADW") provision.  Only 9 of these standstill provisions became inoperable upon the execution of the Merger Agreement, with the remaining 3, including Company B, only being allowed to make a Superior Proposal.

48.     On June 10, 2016, Raptor formally executed an engagement letter with Leerink, and amended the engagement letter with Centerview on June 13, 2016, appointing each of them as a co-lead financial advisor.

49.     In late June 2016, Centerview and Leerink sent a process letter requesting proposals be submitted on or before July 14, 2016.

50.     On July 14, 2016, Horizon, Company A and Company B submitted an indication of interest.  Horizon submitted a proposal for acquisition of 100% of the outstanding shares for $8.00 per share, consisting of $7.00 per share payable in cash at closing and $1.00 per share in the form of a contingent value right payable upon QUINSAIR cumulative net sales in the U.S. of $224 million by the end of 2020.  Company A submitted a proposal for Raptor's assets and business in the European Union and offered $40 million of consideration payable in cash at closing, $177.5 million payable on the achievement of various development and net sales

milestones for PROCYSBI/RP103 in Europe and $177.5 million payable on the achievement of various development and net sales milestones for QUINSAIR/MP-376 in Europe.  Company B submitted a proposal for a potential stock transaction and contemplated an acquisition of 100% of the issued and outstanding shares for $7.00 per share, comprised of $1.00 per share in cash and $6.00 per share payable in shares of Company B common stock to be issued at the closing of the transaction.  Company B was also amendable to increasing the proportion of cash used in the transaction.

51.     On July 19, 2016, the Raptor Board met to discuss the proposals, and instructed Centerview and Leerink to inform Horizon it would need to improve its offer price; Company A that it would need to increase the amount of consideration payable at closing and focus on more near-term milestones in its next bid; and Company B that the Board would need significantly more details.

52.     On July 26, 2016, Horizon submitted a revised proposal for up to $9.00 per share, consisting of $8.50 per share payable in cash at closing and up to $0.50 in the form of a contingent value right related to QUINSAIR.  Based on this proposal, the Board informed Horizon on July 28, 2016, that Horizon would be permitted to move forward in the process.

53.     On August 6, 2016, Company C, a publicly traded biotechnology company in the U.S., submitted a non-binding proposal to acquire all outstanding shares for an aggregate cash amount of $775 million at closing, which implied a per share value of $8.71.

54.     On August 12, 2016, the Raptor Board, Centerview and Leerink instructed each of Horizon, Company A, Company B and Company C to provide best and final offers on September 8, 2016.

55.     On September 8, 2016, Horizon submitted a final proposal to acquire 100% of the outstanding shares for $9.00 per share in cash.  Company A submitted revised proposal for an EMEA Divestiture of $45 million of consideration payable in cash at closing, $193 million payable on the achievement of various development and net sales milestones for PROCYSBI/RP103 in the European Union and $200 million payable on the achievement of various development and net sales milestones for QUINSAIR/MP-376 in the European Union. Company B and Company C did not submit final proposals.

56.     On September 9, 2016, the Board, despite continually rejecting Horizon's proposal as insufficient and not in the best interest of the shareholders, decided to accept Horizon's final proposal without one final attempt at negotiating a higher price, and deciding not to ask for this additional consideration.

57.     On September 10, 2016, Latham delivered to Cooley a revised draft of the disclosure schedules to the merger agreement, including reference to a proposed unallocated retention plan for members of the Raptor management team.

58.     On September 11, 2016, the Board held a telephonic meeting during which Centerview and Leerink separately rendered their opinion that the offer price by Horizon was fair to Raptor's shareholders.

59.     Following the Board meeting, on September 12, 2016, Horizon, Merger Sub and Raptor entered into the Merger Agreement, and the directors and executive officers of Raptor entered into the Tender and Support Agreements with Horizon with respect to the Offer and the Merger.  The parties then issued a joint press release announcing the Tender Offer.

## THE TENDER OFFER

60.     On September 12, 2016, the Company issued a joint press release announcing the

Tender Offer.  That press release stated, in relevant part:

> DUBLIN, Ireland and NOVATO, Calif., Sept. 12, 2016 (GLOBE NEWSWIRE) -- Horizon Pharma plc (NASDAQ:HZNP) and Raptor Pharmaceutical Corp. (NASDAQ:RPTP) today announced the companies have entered into a definitive agreement under which Horizon Pharma will acquire all of the issued and outstanding shares of Raptor Pharmaceutical Corp. common stock for $9.00 per share in cash, for an implied fully diluted equity value of approximately $800 million.  The transaction is expected to close in the fourth quarter of 2016.

> "The proposed acquisition of Raptor furthers our commitment to helping people with rare diseases and is a significant step in advancing our strategy to expand our rare disease business," said Timothy P. Walbert, chairman, president and chief executive officer, Horizon Pharma plc.  "Along with the potential for accelerated revenue growth, the addition of Raptor strengthens our U.S. orphan business and provides a platform to expand our orphan business in Europe and other key international markets.  We look forward to working with new patient communities and building on the success of the Raptor team."

> **Strategic and financial benefits of the transaction:**

> - Strengthens Horizon's focus on rare diseases and provides expansion into Europe and other international markets.
> - Adds PROCYSBI® delayed-release capsules and QUINSAIR™ (aerosolized form of levofloxacin) global rights, with PROCYSBI having strong patent protection through 2034.
> - Diversifies revenue with 11 medicines across three business units: orphan, rheumatology and primary care.
> - Bolsters rare disease revenue, which in the first half of 2016 on a pro-forma basis was 45 percent of total Horizon Pharma revenue.
> - Expected to be accretive to adjusted EBITDA in 2017.

> "This transaction will deliver significant and immediate value to our shareholders through a compelling all-cash premium and provide ongoing value to our patients, their families and the physicians who treat them," said Julie Anne Smith, president and chief executive officer, Raptor Pharmaceutical Corp.  "On behalf of the Board and management team, I extend our deepest gratitude to everyone at Raptor for their unrelenting commitment to advancing the development of our medicines and their tireless work with the patients we serve."

> PROCYSBI is the first cystine-depleting agent given every 12 hours that is approved in the United States for the treatment of nephropathic cystinosis (NC), a rare metabolic disorder, in adults and children 2 years of age and older.  PROCYSBI received European Commission approval as an orphan medicinal product in September 2013 for the treatment of proven NC.  According to estimates, NC prevalence is as high as 1 in 100,000 live births.  There are

believed to be approximately 550 NC patients in the United States and 2,000 worldwide.

QUINSAIR is a proprietary inhaled formulation of levofloxacin, approved in the European Union and Canada for the management of chronic pulmonary infections due to *Pseudomonas aeruginosa* in adult patients with cystic fibrosis. Cystic fibrosis is a rare, life-threatening, genetic disease affecting an estimated 21,000 adults in Europe and Canada. QUINSAIR is not approved in the United States.

Raptor's previously disclosed total net sales guidance for full-year 2016 is $125 million to $135 million, which includes both PROCYSBI and QUINSAIR. Horizon will provide additional detail regarding its guidance for full year 2017 net sales and adjusted EBITDA in the first quarter 2017.

61. Also on September 12, 2016, the Company filed a Form 8-K with the SEC, wherein it attached the Merger Agreement. Collectively, the press release announcing the transaction and the filing of the Merger Agreement reveal that the Tender Offer is the product of a flawed sales process and, unless the Merger Consideration is increased, would be consummated at an unfair price.

62. Furthermore, the sale of the Company is being timed in an effort to curb any future increase in the share price of Raptor common stock, thus ensuring that Horizon can effectuate its takeover on the cheap.

63. Moreover, the Company is poised to enjoy a lengthy period of significant growth as it offers new products and expands into burgeoning markets, growth that Plaintiff and the Class will be foreclosed from fully enjoying upon the consummation of the Tender Offer.

**THE MERGER AGREEMENT UNFAIRLY DETERS COMPETITIVE OFFERS AND IS UNDULY BENEFICIAL TO HORIZON**

64. The Tender Offer is also unfair because, as part of the Merger Agreement, Defendants agreed to certain onerous and preclusive deal protection devices that operate conjunctively to make the Tender Offer *a fait accompli* and ensure that no competing offers will emerge for the Company.

65.     First, Section 5.3 of the Merger Agreement explicitly prohibits Raptor or any of

its affiliates from soliciting or proactively seeking a competing or better offer, as Section 5.3(a)

states:

> (a) Subject to Section 5.3(c), at all times during the period commencing on the
> date of this Agreement and continuing until the earlier to occur of the termination
> of this Agreement pursuant to Article VIII and the Effective Time, the Company
> and its Subsidiaries shall not, nor shall they authorize or permit any of their
> respective directors, officers or other employees, controlled Affiliates, or any
> investment banker, attorney or other authorized agent or representative retained
> by any of them (collectively, "Representatives") to, directly or indirectly, (i)
> solicit, initiate, knowingly encourage, or knowingly facilitate or assist (including
> by way of providing information), any proposal that constitutes or could
> reasonably be expected to lead to an Acquisition Proposal, (ii) participate or
> engage in any discussions or negotiations with any Person (other than Parent,
> Merger Sub and their Representatives) regarding any proposal that constitutes or
> could reasonably be expected to lead to an Acquisition Proposal, (iii) enter into
> any merger agreement, purchase agreement, letter of intent or similar agreement
> with respect to an Acquisition Transaction (other than an Acceptable
> Confidentiality Agreement entered into pursuant to Section 5.3(c)), (iv) release or
> waive any provision of, or fail to enforce any confidentiality agreement, standstill
> or similar agreement to which the Company or any of its Subsidiaries is a party,
> or (v) resolve, publicly propose or agree to do any of the foregoing. The Company
> and its Subsidiaries shall cease all existing discussions or negotiations with any
> Person (other than Parent, Merger Sub and their Representatives) conducted prior
> to the date of this Agreement with respect to any proposal that constitutes or could
> reasonably be expected to lead to any Acquisition Proposal. Promptly after the
> date of this Agreement, the Company will request that each Person (if any) that
> has executed a confidentiality agreement (other than the Confidentiality
> Agreement) relating to a potential Acquisition Proposal promptly return to the
> Company or destroy all non-public documents and materials furnished by the
> Company or any of its Representatives to such Person pursuant to the terms of
> such confidentiality agreement and immediately terminate all physical and
> electronic data room access relating to a potential Acquisition Proposal previously
> granted to any such Person. Notwithstanding anything to the contrary contained in
> this Agreement, the Company and its Representatives may participate in
> discussions solely to seek to clarify the terms and conditions of any inquiry or
> proposal made by any Person.

66.     In addition, Section 8.3(c) grants Pfizer recurring and unlimited matching rights,

which gives Raptor twenty-four (24) hours to provide unfettered access to confidential, non-

public information about competing proposals from third parties which Horizon can then use to

prepare a matching bid.  Additionally, Section 6.1(c) grants Horizon four (4) business days to negotiate with Raptor, amend the terms of the Merger Agreement, and make a counter-offer that only matches the superior third-party offer.

67.     Further, Section 8.4 of the Merger Agreement requires the Company to pay Horizon a termination fee of $30 million in the event the Company decides to pursue any alternative offer.  This coercive termination fee would require any competing bidder to agree to pay a naked premium simply for the right to provide Raptor's stockholders a superior offer.

68.     Ultimately, these preclusive deal protection provisions illegally restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company. The narrow circumstances under which the Board may respond to alternative proposals and the Company's inability to terminate the Merger Agreement if it accepts a superior proposal fail to provide an effective "fiduciary out" under the Merger Agreement.

69.     Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that the Company's stockholders will continue to suffer absent judicial intervention.

## THE 14D-9 FAILS TO DISCLOSE MATERIAL INFORMATION

70.     On September 26, 2016, the Company filed the materially incomplete and misleading 14D-9 with the SEC and disseminated it to Raptor's stockholders.  The 14D-9, which is devised to solicit stockholders to tender their shares in the Tender Offer, fails to provide material information necessary for Raptor's stockholders to make an informed decision on whether to tender their shares, in violation of Sections 14(e) and 20(a) of the Exchange Act. Therefore, despite the Company's poise for future growth, and the promising success of its new

products and trials, the Board conducted a flawed sales process, only one month after determining it was not the appropriate time for the Company, for their own self-interest.

71.     The 14D-9 fails to address the misstatements and omissions raised by Plaintiff herein.  Specifically, the 14D-9 omits/or misrepresents the material information set forth below in contravention of Sections 14(e) and 20(a) of the Exchange Act, rendering shareholders unable to make an informed decision on whether to tender their shares.

72.     The omitted information described herein, if and when disclosed, would significantly alter the totality of information available for consideration by the average Raptor shareholder.  Specifically, the 14D-9 fails to provide the Company's shareholder with material information and/or provides materially misleading information regarding: (a) the financial projections prepared by Raptor's management, which were utilized by the Company's financial advisers, Centerview and Leerink in their jointly prepared financial analyses underlying their fairness opinions; and (b) the data and inputs underlying the financial valuation analyses that purport to support these fairness opinions

### *Material Omissions Concerning Management's Financial Projections*

73.     The 14D-9 fails to provide a fair summary of the financial projections of Raptor prepared by Raptor management that were provided to and relied upon by Centerview and Leerink in performing their joint financial analyses and which are necessary for Raptor shareholders to make an informed decision on whether to tender their shares in the Tender Offer. Notably, the 14D-9 fails to disclose the risk-adjusted and non-risk adjusted financial projections provided by Raptor management and relied upon by Centerview and Leerink for purposes of its analysis, for fiscal years 2016-2035, for the following items:

(a)     Gross margin by specific product;

(b)      EBITDA by specific product;

(c)      EBIT (or D&A) by specific product (and consolidated for non-risk adjusted forecast); and

(d)      Unlevered free cash flow by specific product (and consolidated for non-risk adjusted forecast).

74.      With regard to the financial projections, the 14D-9 also fails to disclose the additional specific risk adjustments for the risk-adjusted forecast other than the probability of success.

75.      The omission of the above information makes the following information materially misleading:

(a)      On pages 44-46 of the 14D-9, the following charts:

*Risk-Adjusted Long-Term Forecast*



Note: Dollars in millions. Percent of revenue < 0.5% denoted as (NM) to indicate not meaningful.
(1)  Includes risk-adjusted milestone payments above recorded fair value for U.S. Cystic Fibrosis approval ($40 million payable with up to 50% electable in stock; assumes $20 million in cash) and for initiation of Phase 3 trial in Bronchiectasis ($20 million payable with up to 50% electable in stock; assumes $10 million in cash). Includes stock-based compensation expenses.
(2)  Includes risk-adjusted milestone payments above recorded fair value for U.S. / Europe launch in first indication after Cystic Fibrosis ($75 million payable for each of U.S. / Europe). Includes stock-based compensation expenses.
(3)  Includes stock-based compensation expenses.
(4)  Represents prepayment expense for retirement of HealthCare Royalty Partners notes payable and convertible debt.
(5)  Based on U.S. tax rate of 40% and Europe / Rest of the World tax rate of 5% and includes utilization of Year End-2015 federal Net Operating Losses of $61 million and utilization of Year End-2015 Research and Development tax credits of $21 million.
(6)  Probability of Success.

*Non Risk-Adjusted All Programs Long-Term Forecast*

| | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Detailed income statement** | | | | | | | | | | | |
| **Net Revenue** | | | | | | | | | | | |
| PROCYSBI for Nephropathic Cystinosis | $ 120 | $ 158 | $ 202 | $ 257 | $ 308 | $ 331 | $ 351 | $ 369 | $ 388 | $ 406 | $ 426 |
| RP-105 for Huntington's Disease | — | — | — | — | — | — | — | 176 | 349 | 543 | 745 |
| QUINSAIR for Cystic Fibrosis | 2 | 27 | 79 | 101 | 132 | 177 | 193 | 209 | 222 | 236 | 251 |
| RP-103 Mitochondrial Diseases | — | — | — | — | 58 | 124 | 191 | 261 | 328 | 383 | 397 |
| MP-376 Bronchiectasis | — | — | — | — | 75 | 146 | 305 | 398 | 416 | 435 | 455 |
| MP-376 Nontuberculous Mycobacteria | — | — | — | — | — | — | — | 64 | 135 | 305 | 430 |
| **Total Net Revenue** | 122 | 186 | 281 | 358 | 573 | 777 | 1,040 | 1,478 | 1,838 | 2,308 | 2,703 |
| **Total Cost of Sales(1)** | (18) | (24) | (36) | (43) | (65) | (87) | (115) | (166) | (214) | (272) | (318) |
| **Gross profit** | 104 | 162 | 245 | 316 | 508 | 690 | 925 | 1,312 | 1,624 | 2,036 | 2,385 |
| *Gross Margin %* | *86%* | *87%* | *87%* | *88%* | *89%* | *89%* | *89%* | *89%* | *88%* | *88%* | *88%* |
| **Research & Development** | | | | | | | | | | | |
| Total Research & Development | (93) | (157) | (86) | (84) | (74) | (91) | (71) | (52) | (51) | (52) | (53) |
| **Selling & Marketing** | | | | | | | | | | | |
| Total Sales & Mktg | (46) | (66) | (67) | (102) | (211) | (136) | (218) | (381) | (323) | (346) | (350) |
| General & Administrative | ($ 33) | ($ 35) | ($ 36) | ($ 37) | ($ 39) | ($ 40) | ($ 41) | ($ 69) | ($ 96) | ($ 125) | ($ 153) |
| Total Oper Costs. Excl. Cost of Goods Sold | (172) | (258) | (189) | (223) | (324) | (266) | (330) | (502) | (471) | (523) | (556) |
| **Operating profit** | ($ 68) | ($ 96) | $ 56 | $ 93 | $ 184 | $ 424 | $ 595 | $ 810 | $ 1,154 | $ 1,513 | $ 1,829 |

Note: Dollars in millions.
(1) Excludes royalties due to MPEX on QUINSAIR/MP-376 sales.

*Unlevered Free Cash Flows—Risk-Adjusted Long-Term Forecast*

| | Year Ending December 31, | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2016E | 2017E | 2018E | 2019E | 2020E | 2021E | 2022E | 2023E | 2024E | 2025E | 2026E | 2027E | 2028E | 2029E | 2030E | 2031E | 2032E | 2033E | 2034E | 2035E |
| Operating Income(1) | ($ 60) | ($ 16) | $ 8 | $ 44 | $ 88 | $ 168 | $ 238 | $ 341 | $ 428 | $ 286 | $ 282 | $ 250 | $ 224 | $ 232 | $ 254 | $ 279 | $ 71 | $ 18 | $ 4 | $ 1 |
| Tax Expense(2) | — | (3) | (7) | (15) | (21) | (51) | (73) | (106) | (138) | (97) | (95) | (95) | (89) | (94) | (103) | (113) | (29) | (7) | (2) | (0) |
| Plus: Depreciation & Amortization | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 |
| Plus: Non-Cash / Contingent Liability Charges | 25 | 6 | — | — | 1 | — | — | — | — | — | — | — | — | — | — | — | — | — | — | — |
| Less: Working Capital | (4) | (8) | (5) | (7) | (10) | (17) | (14) | (20) | (17) | 36 | 1 | 14 | 10 | 0 | (3) | (4) | 46 | 12 | 3 | 1 |
| Less: Capex | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) |
| Less: QUINSAIR Milestone Payments(3) | — | (20) | — | — | ($7) | — | — | — | — | — | — | — | — | — | — | — | — | — | — | — |
| Unlevered Free Cash Flow(4) | ($ 40) | ($ 41) | ($ 4) | $ 22 | ($ 30) | $ 99 | $ 152 | $ 214 | $ 273 | $ 224 | $ 187 | $ 168 | $ 144 | $ 138 | $ 147 | $ 162 | $ 88 | $ 22 | $ 5 | $ 1 |

Note: Dollars in millions.
(1) Includes stock-based compensation expenses.
(2) Unlevered tax expense if profitable based on U.S. tax rate of 40% and Europe / Rest of the World tax rate of 5% and excludes utilization of federal Net Operating Losses and Research and Development tax credits.
(3) Assumes all cash milestone payments.
(4) Unlevered free cash flow is a non-U.S. GAAP financial measure calculated by starting with operating income (as shown in the table above) and subtracting estimated tax expense, capital expenditures, investment in working capital, certain one-time cash milestone expenses and then adding back depreciation and amortization expense and non-cash / contingent liability charges.

76.     These statements are rendered false and/or misleading by the omissions identified above because without full access to the estimates of Raptor's future cash flows, Company shareholders cannot reliably compare the intrinsic value of the Company to the proposed Merger Consideration offered by Horizon, and thus cannot determine whether the Tender Offer is indeed fair, as Defendants, Centerview, and Leerink allege in the 14D-9.  Moreover, these projections

form the backbone of the DCF Analysis prepared jointly by Centerview and Leerink in their fairness opinion.

77.     It is well-settled that management's financial projections are the lifeblood of the Company and are crucial to providing stockholders with management's inside view of the Company's value and future prospects.  Stockholders are entitled to know about the Company's promising future financial prospects before being asked to tender their shares in the Tender Offer.  This expected performance is more reliable than similar forecasts prepared by third-party analysts and other non-insiders as it comes from members of corporate management who have their fingers on the pulse of the company.  This is particularly true when the stockholders will be cashed out of the Company, because unlike a stock transaction, the stockholders will have no participation in the success of the future combined companies.  Therefore, it is important to know what management and the company's financial advisor's best estimate of those future cash flows would be.  Moreover, such forecasts are material to Plaintiff and other reasonable investors because, in addition to the few line item projections disclosed in the 14D-9, Centerview and Leerink reviewed and relied upon the omitted projections in preparing their fairness opinion. This data is necessary for making an informed decision about whether to support the Tender Offer and, thus, must be disclosed.

### Material Omissions Concerning Centerview and Leerink's Joint Analysis

78.     The 14D-9 describes Centerview and Leerink's fairness opinions and the various valuation analyses they performed in support of their opinion.  However, the description of Centerview and Leerink's fairness opinion and analyses fails to include key inputs and assumptions underlying these analyses.  Without this information, as described below, Raptor's public stockholders are unable to fully understand these analyses and, thus, are unable to

determine what weight, if any, to place on Centerview and Leerink's fairness opinion in determining whether to tender their shares in the Tender Offer.

79.     With respect to Centerview and Leerink's *Selected Public Companies Analysis,* the 14D-9 fails to disclose whether Centerview and Leerink performed any type of benchmarking analysis for Raptor in relation to the selected public companies.

80.     The omission of the above information makes the following information materially misleading:

(a)     On pages 35-36 of the 14D-9, the information:

*Selected Public Company Analysis*

The Raptor Financial Advisors reviewed and compared certain financial information for Raptor to corresponding financial information for the following publicly traded companies that the Raptor Financial Advisors deemed comparable, based on their experience and professional judgment, to Raptor.

- Supernus Pharmaceuticals, Inc.
- Acorda Therapeutics, Inc.
- Insys Therapeutics, Inc.
- Retrophin, Inc.
- Vanda Pharmaceuticals Inc.
- Corcept Therapeutics Incorporated
- Keryx Biopharmaceuticals, Inc.
- Merrimack Pharmaceuticals, Inc.

Although none of the selected companies is directly comparable to Raptor, the companies listed above were chosen by the Raptor Financial Advisors, among other reasons, because they are publicly traded commercial-stage biopharmaceutical companies with certain operational, business and/or financial characteristics that, for purposes of the Raptor Financial Advisors' analysis, may be considered similar to those of Raptor.

The Raptor Financial Advisors calculated and compared financial multiples for the selected companies based on information they obtained from public filings, FactSet (a data source containing historical and estimated financial data) and other Wall Street research. With respect to each of the selected companies, the Raptor Financial Advisors calculated enterprise value (calculated as the market value of common equity (determined using the treasury stock method and taking into account outstanding in-the-money options, warrants, RSUs and other convertible securities, plus the book value of debt and certain liabilities (excluding any contingent consideration) less cash and cash equivalents) as a multiple of Wall Street research analyst consensus estimated revenues for calendar years 2017 and 2018. Each of the selected companies had an equity value between approximately $500 million and $1.5 billion as of September 9, 2016.

The results of this analysis are summarized as follows:

|  | Revenue Multiple | |
| --- | --- | --- |
|  | 2017E | 2018E |
| Supernus Pharmaceuticals, Inc. | 3.5x | 2.8x |
| Acorda Therapeutics, Inc. | 2.4x | 2.0x |
| Insys Therapeutics, Inc. | 2.4x | 2.1x |
| Retrophin, Inc. | 4.0x | 2.7x |
| Vanda Pharmaceuticals Inc. | 3.2x | 2.8x |
| Corcept Therapeutics Incorporated | 5.0x | 2.4x |
| Keryx Biopharmaceuticals, Inc. | 7.6x | 3.2x |
| Merrimack Pharmaceuticals, Inc. | 4.8x | 3.0x |

|  | Revenue Multiple | |
| --- | --- | --- |
|  | 2017E | 2018E |
| 75th Percentile | 4.8x | 2.8x |
| Median | 3.7x | 2.7x |
| 25th Percentile | 3.0x | 2.3x |

Based on the foregoing, the Raptor Financial Advisors applied a range of: (i) 3.0x to 4.8x, representing the 25th and 75th percentiles, respectively, of estimated 2017 revenue multiples derived from the selected companies, to Raptor's estimated calendar year 2017 revenue of approximately $176 million, based on the Risk-Adjusted Long-Term Forecast, which resulted in an implied per share equity value range for the Shares of approximately $6.25 to $9.70; and (ii) 2.3x to 2.8x, representing the 25th and 75th percentiles, respectively, of estimated 2018 revenue multiples derived from the selected companies, to Raptor's estimated calendar year 2018 revenue of approximately $204 million, based on the Risk-Adjusted Long-Term Forecast, which resulted in an implied per share equity value range for the Shares of approximately $5.65 to $6.75. The Raptor Financial Advisors compared these ranges to the Offer Price of $9.00 per Share to be paid to the holders of Shares (other than Excluded Shares) pursuant to the Merger Agreement.

81.     With respect to Centerview and Leerink's *Selected Precedent Transactions Analysis,* the 14D-9 fails to disclose whether Centerview and Leerink performed any type of benchmarking analysis for Raptor in relation to the target companies.

82.     The omission of the above information makes the following information materially misleading:

(a)     On pages 37-38 of the 14D-9, the information:

The results of this analysis are summarized as follows:

| Date Announced | Target | Acquiror | Transaction Value / One Year Forward Revenue (Wall Street / Public) | Transaction Value / One Year Forward Revenue (Proxy) |
|---|---|---|---|---|
| 05/23/16 | Xenoport, Inc. | Arbor Pharmaceuticals, LLC | 5.0x | 5.5x |
| 12/11/15 | Crealta Holdings LLC | Horizon Pharma plc | 6.8x | 6.8x |
| 03/30/15 | Hyperion Therapeutics, Inc. | Horizon Pharma plc | 7.2x | 7.1x |
| 03/05/15 | Ikaria, Inc. | Mallinckrodt plc | 5.7x | 5.7x |
| 10/09/14 | Auxilium Pharmaceuticals, Inc. | Endo International plc | 5.5x | 5.2x |
| 09/29/14 | Lumara Health Inc. | AMAG Pharmaceuticals, Inc. | 2.9x | 2.9x |
| 03/19/14 | Vidara Therapeutics International plc | Horizon Pharma plc | 8.9x | 8.9x |
| 02/11/14 | Cadence Pharmaceuticals, Inc. | Mallinckrodt plc | 7.4x | 6.8x |
| 11/05/13 | Paladin Labs Inc. | Endo Health Solutions Inc. | 5.1x | 5.3x |
| 07/30/13 | Optimer Pharmaceuticals, Inc. | Cubist Pharmaceuticals, Inc. | 3.9x | 4.1x |
| 04/29/13 | Actient Holdings LLC | Auxilium Pharmaceuticals, Inc. | 4.3x | 4.3x |
| 04/26/12 | EUSA Pharma Inc. | Jazz Pharmaceuticals plc | 3.6x | 3.6x |
| 03/26/12 | ISTA Pharmaceuticals, Inc. | Bausch & Lomb Incorporated | 2.5x | 2.0x |

| | Transaction Value / One Year Forward Revenue (Wall Street / Public) | Transaction Value / One Year Forward Revenue (Proxy) |
|---|---|---|
| 75th Percentile | 6.8x | 6.8x |
| Median | 5.1x | 5.3x |
| 25th Percentile | 3.9x | 4.1x |

Based on this analysis and other considerations that the Raptor Financial Advisors deemed relevant in their professional judgment and expertise, the Raptor Financial Advisors applied an illustrative range of 3.9x to 6.8x, representing the 25th and 75th percentiles, respectively, of one-year forward revenue multiples derived from the precedent transactions, to Raptor's estimated one-year forward revenue of approximately $166 million as derived from the Risk-Adjusted Long-Term Forecast, which resulted in an implied per share equity value range for the Shares of approximately $7.30 to $12.45. The Raptor Financial Advisors compared this range to the Offer Price of $9.00 per Share to be paid to the holders of Shares (other than Excluded Shares) pursuant to the Merger Agreement.

*Selected Precedent Transactions Analysis*

The Raptor Financial Advisors reviewed and analyzed certain information relating to selected transactions involving commercial-stage biopharmaceutical companies that the Raptor Financial Advisors, based on their experience and judgment as financial advisors, deemed relevant to consider in relation to Raptor and the Transaction. These transactions were:

| Date Announced | Target | Acquiror |
|---|---|---|
| 05/23/16 | Xenoport, Inc. | Arbor Pharmaceuticals, LLC |
| 12/11/15 | Crealta Holdings LLC | Horizon Pharma plc |
| 03/30/15 | Hyperion Therapeutics, Inc. | Horizon Pharma plc |
| 03/05/15 | Ikaria, Inc. | Mallinckrodt plc |
| 10/09/14 | Auxilium Pharmaceuticals, Inc. | Endo International plc |
| 09/29/14 | Lumara Health Inc. | AMAG Pharmaceuticals, Inc. |
| 03/19/14 | Vidara Therapeutics International plc | Horizon Pharma plc |
| 02/11/14 | Cadence Pharmaceuticals, Inc. | Mallinckrodt plc |
| 11/05/13 | Paladin Labs Inc. | Endo Health Solutions Inc. |
| 07/30/13 | Optimer Pharmaceuticals, Inc. | Cubist Pharmaceuticals, Inc. |
| 04/29/13 | Actient Holdings LLC | Auxilium Pharmaceuticals, Inc. |
| 04/26/12 | EUSA Pharma Inc. | Jazz Pharmaceuticals plc |
| 03/26/12 | ISTA Pharmaceuticals, Inc. | Bausch & Lomb Incorporated |

No company or transaction used in this analysis is identical or directly comparable to Raptor or the Transaction. The companies included in the selected transactions above were selected, among other reasons, because they have certain characteristics that, for the purposes of this analysis, may be considered similar to certain characteristics of Raptor. The reasons for and the circumstances surrounding each of the selected precedent transactions analyzed were diverse and there are inherent differences in the business, operations, financial conditions and prospects of Raptor and the companies included in the selected precedent transactions analysis. This analysis involves complex considerations and qualitative judgments concerning differences in financial and operating characteristics and other factors that could affect the public trading, acquisition or other values of the selected target companies and Raptor.

Financial data for the precedent transactions was based on publicly available information at the time of the announcement of the relevant transactions that the Raptor Financial Advisors obtained from public filings, Wall Street research and FactSet. Centerview's analysis used publicly available information obtained from Wall Street research, public filings and Factset, and Leerink's analysis used publicly available information obtained from public filings (including proxy and Schedule TO filings) and Wall Street research. Using these methodologies, each of Centerview and Leerink calculated for each selected transaction, the transaction value (calculated as the offer value, which means the equity value of common equity (determined using the treasury stock method and taking into account outstanding in-the-money options, warrants, RSUs and other convertible securities), plus the book value of debt and certain liabilities (excluding any contingent consideration) less cash and cash equivalents) implied for each target company based on the consideration payable in the applicable selected transaction as a multiple of the target company's forward projected revenue one year following the transaction announcement. Each of the selected transactions had an offer value between approximately $500 million and $2.5 billion.

83.     With respect to Centerview and Leerink's *Discounted Cash Flow Analysis,* the 14D-9 fails to disclose the individual inputs and assumptions utilized by Centerview and Leerink to derive the discount rate range of 11.0% - 13.0%.

84.     The omission of the above information makes the following information materially misleading:

(a)     On pages 38-39 of the 14D-9, the information:

*Discounted Cash Flow Analysis*

The Raptor Financial Advisors performed a discounted cash flow analysis of Raptor based on the Risk-Adjusted Long-Term Forecast. A discounted cash flow analysis is a traditional valuation methodology used to derive a valuation of an asset or set of assets by calculating the "present value" of estimated future cash flows of the asset or set of assets.  "Present value" refers to the current value of future cash flows or amounts and is obtained by discounting those future cash flows or amounts by a discount rate that takes into account macroeconomic assumptions and estimates of risk, the opportunity cost of capital, expected returns and other appropriate factors. Based on information from management of Raptor, the Raptor Financial Advisors derived the forecasted unlevered free cash flows of Raptor during the period beginning on October 1, 2016 and ending on December 31, 2035, and assumed that unlevered free cash flows would decline in perpetuity after December 31, 2035 at a rate of free cash flow decline of 75.0% year-over-year. The unlevered free cash flows were then discounted to present values using a range of discount rates from 11.0% to 13.0% using a mid-year convention. This range of discount rates was based on the analysis of each of Centerview and Leerink of Raptor's weighted average cost of capital. In performing its discounted cash flow analysis, the Raptor Financial Advisors adjusted for (i) cash balances, including cash and cash equivalents, estimated by Raptor's management to equal approximately $116 million as of September 30, 2016, (ii) outstanding HealthCare Royalty loan, estimated by Raptor's management to equal $42 million as of September 30, 2016, (iii) $60 million in outstanding 8% convertible senior notes due 2019 as of September 30, 2016 and (iv) net present value of standalone tax savings from estimated U.S. federal net operating losses and research & development tax credits and future losses.

This analysis resulted in an implied per share equity value for the Shares of approximately $7.30 to $8.50. The Raptor Financial Advisors then compared the above analysis to the Offer Price of $9.00 per Share to be paid to the holders of Shares (other than Excluded Shares) pursuant to the Merger Agreement.

85.     The above statements are rendered misleading by the omissions because they give a materially incomplete and misleading picture of the sales process, and in particular, fail to disclose all material facts necessary for shareholders to determine whether the Board carried out a full and fair sales process designed to maximize the sales price.

86.     Cumulatively, the information requested above is necessary for one to be able to evaluate and understand the sales process and analysis rendered in connection with the Tender Offer.   Therefore, the aforementioned omitted information is highly relevant and material to Raptor shareholders.

87.     Accordingly, because the foregoing material misstatements and omissions represent a violation of federal law, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that Company stockholders will continue to suffer absent judicial intervention.

## CLAIMS FOR RELIEF

### COUNT I
### Violations of Section 14(e) of the Exchange Act
### (Against All Defendants)

88.     Plaintiff repeats all previous allegations as if set forth in full herein.

89.     Defendants have disseminated the 14D-9 with the intention of soliciting stockholders to tender their shares in the Tender Offer.

90.     Section 14(e) of the Exchange Act provides that in the solicitation of shares in a tender offer, "[i] shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading[.]

91.     The 14D-9 was prepared in violation of Section 14(e) because it is materially misleading in numerous respects and omits material facts, including those set forth above. Moreover, in the exercise of reasonable care, Defendants knew or should have known that the 14D-9 is materially misleading and omits material facts that are necessary to render them non-misleading.

28

92.     The Individual Defendants had actual knowledge or should have known of the misrepresentations and omissions of material facts set forth herein.

93.     The misrepresentations and omissions in the 14D-9 are material to Plaintiff and the Class, and Plaintiff and the Class will be deprived of their entitlement to decide whether to tender their shares on the basis of complete information if such misrepresentations and omissions are not corrected prior to expiration of the tender offer on September 27, 2016.

## COUNT II
### Violations of Section 14(d)(4) of the Exchange Act and SEC Rule 14d-9
### (Against All Defendants)

94.     Plaintiff repeats all previous allegations as if set forth in full herein

95.     Defendants have disseminated the 14D-9 with the intention of soliciting stockholders to tender their shares in the Tender Offer

96.     Section 14(d)(4) of the Exchange Act and SEC Rule 14d-9 promulgated thereunder require full and complete disclosure in connection with tender offers. Pursuant to Item 8 of SEC Rule 14d-9(d), the Board was required to "[f]urnish such additional information, . . . as may be necessary to make the [14D-9's] required statements, in light of the circumstances under which they are made, not materially misleading."

97.     As set forth above, the 14D-9 is materially misleading in numerous respects and omits material facts. Indeed, Defendants make certain partial disclosures in the 14D-9 that must be supplemented so as to make them not materially misleading.

98.     The misrepresentations and omissions in the 14D-9 are material to Plaintiff and the Class, and Plaintiff and the Class will be deprived of their entitlement to decide whether to tender their shares on the basis of complete information if such misrepresentations and omissions are not corrected prior to expiration of the tender offer currently set for September 27, 2016

## COUNT III
## Violations of Section 20(a) of the Exchange Act
### (Against All Individual Defendants)

99.     Plaintiff repeats all previous allegations as if set forth in full herein.

100.    The Individual Defendants were privy to non-public information concerning the Company and its business and operations via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or should have known that the 14D-9 was materially misleading to Company stockholders.

101.    The Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the materially false and misleading statements complained of herein. The Individual Defendants were aware or should have been aware that materially false and misleading statements were being issued by the Company in the 14D-9 and nevertheless approved, ratified and/or failed to correct those statements, in violation of federal securities laws. The Individual Defendants were able to, and did, control the contents of the 14D-9. The Individual Defendants were provided with copies of, reviewed and approved, and/or signed the 14D-9 before its issuance and had the ability or opportunity to prevent its issuance or to cause it to be corrected.

102.    The Individual Defendants also were able to, and did, directly or indirectly, control the conduct of Raptor's business, the information contained in its filings with the SEC, and its public statements. Because of their positions and access to material non-public information available to them but not the public, the Individual Defendants knew or should have

30

known that the misrepresentations specified herein had not been properly disclosed to and were being concealed from the Company's stockholders and that the 14D-9 was misleading. As a result, the Individual Defendants are responsible for the accuracy of the 14D-9 and are therefore responsible and liable for the misrepresentations contained herein.

103.    The Individual Defendants acted as controlling persons of Raptor within the meaning of Section 20(a) of the Exchange Act. By reason of their position with the Company, the Individual Defendants had the power and authority to cause Raptor to engage in the wrongful conduct complained of herein. The Individual Defendants controlled Raptor and all of its employees. As alleged above, Raptor is a primary violator of Section 14 of the Exchange Act and SEC Rule 14d-9.  By reason of their conduct, the Individual Defendants are liable pursuant to section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment and relief as follows:

A.    Ordering that this action may be maintained as a class action and certifying Plaintiff as the Class representative and Plaintiff's counsel as Class counsel;

B.    Enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Tender Offer, unless and until the Company: (i) adopts and implements a procedure or process to obtain a merger agreement providing the best possible terms for the Company's stockholders; and (ii) discloses the material information discussed above which has been omitted from the 14D-9;

C.    In the event defendants consummate the Tender Offer, rescinding it and setting it aside or awarding rescissory damages to Plaintiff and the Class;

D.    Directing defendants to account to Plaintiff and the Class for their damages

sustained because of the wrongs complained of herein;

E.     Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

F.     Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: October 7, 2016

**RIGRODSKY & LONG, P.A.**

By:   */s/ Brian D. Long*

**OF COUNSEL:**

**LEVI & KORSINSKY, LLP**
Shane T. Rowley
733 Summer Street, Suite 304
Stamford, CT 06901
Tel.: (212) 363-7500

Seth D. Rigrodsky (#3147)
Brian D. Long (#4347)
Gina M. Serra (#5387)
2 Righter Parkway, Suite 120
Wilmington, DE 19803
Tel.:  (302) 295-5310
Fax:  (302) 654-7530
Email:  sdr@rl-legal.com
Email:  bdl@rl-legal.com
Email:  gms@rl-legal.com

*Attorneys for Plaintiff*